**Opinion issued December 15, 2020**



In The

# Court of Appeals

For The

# First District of Texas

_____

**NO. 01-19-00282-CR**
_____

**DWIGHT GOFFNEY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from 248th District Court**
**Harris County, Texas**
**Trial Court Case No. 1570145**

## MEMORANDUM OPINION

A jury found appellant, Dwight Goffney, guilty of the felony offense of

aggravated assault.[1] After appellant pleaded true to the allegation in an enhancement

---

[1]     *See* TEX. PENAL CODE ANN. § 22.02(a), (b).

paragraph that he had been previously convicted of a felony offense, the jury assessed his punishment at confinement for five years and a $5,000 fine. In four issues, appellant contends that the trial court erred in instructing the jury and his trial counsel provided him with ineffective assistance of counsel.

We modify the trial court's judgment and affirm as modified.

## Background

The complainant, Roberto Mena, testified that in October 2015, he was self-employed as a contractor. In October 2015, he did some remodeling work for Tereza Demonbreun, the owner of a home at 451 Woodrail Street in Harris County, Texas. The complainant lived a few blocks away from Demonbreun's home, and as he was driving by her home one day, he saw her struggling with a piece of drywall in her garage. He stopped to help her and learned that her home had been damaged by a hurricane. After they talked, the complainant agreed to do some work for Demonbreun at her home. The complainant was to perform "demo[lition], take down all the drywall and insulation, repair it, put new insulation in, drywall, texture, [and] paint . . . ."

About three days after starting the job at Demonbreun's home, the complainant met Jessica Dennee—appellant's girlfriend and Demonbreun's daughter—who was at the home with her newborn baby. The complainant also became acquainted with appellant, who also was on the property. Appellant told the

complainant that Demonbreun "wasn't alone," and threatened him not to "mess with [his] family." The complainant responded that it "wasn't [his] intention, that [he] was there to help out."

After the complainant completed his work at Demonbreun's home, he did a walk-through of the home with Demonbreun to show her the work. Demonbreun had "some issues" because she decided to have plumbing work done in the home and the plumbers had been "making big holes in the wall" and "destroying [his] job." The complainant agreed to have Demonbreun mark the issues that she saw with blue tape, and he went back the next day to "take care" of them. He did not fix any of the wall damage caused by the plumbers because "it was not part of [his] contract." Then, he went back the following day, a Friday, to finish the cleanup.

On Saturday, the complainant received a text message from Demonbreun telling him that appellant "was going to take over everything with money and any job that needed to be done." The complainant thought this would be a problem because his work "was already done; and . . . [appellant] didn't know what was going on" because "[h]e was never in the house."

On October 15, 2017, appellant sent a text message to the complainant and scheduled an appointment to meet the complainant at Demonbreun's house at 3:00 p.m. At 3:02 p.m., appellant sent the complainant a text message "to see if [he] was going to be able to be there at [the] appointment." The complainant responded,

3

"yes, [and] that [he] was on [his] way." At 3:05 p.m., the complainant received another text message from appellant asking "where was [he]." The repeated text messages were a "red flag" for the complainant, and he was concerned.

The complainant arrived at Demonbreun's home about ten minutes late to his appointment with appellant. He believed that Demonbreun would be at the home along with appellant, but he did not see her car. He took out his cellular telephone and began recording because he suspected that there "wasn't going to be something good [coming] out of this."

As he approached the house, the complainant walked into the garage, and found Dennee and appellant sitting inside. The complainant asked appellant "what seem[ed] to be the problem," and appellant had the complainant follow him inside the home to a bathroom. The house was still under construction, and on the way to the bathroom, the complainant saw that someone had taken down the kitchen cabinets, and there were cabinets on the floor and other materials. The bathroom was dark, and the complainant saw a piece of drywall and a two-by-four wooden board by the bathroom door.

The complainant followed appellant into the bathroom, while Dennee remained in the hallway outside the bathroom. Appellant told the complainant that he had "missed a spot[] [and] that [he] oversprayed the toilet" with the wall texturing product. The complainant admitted that "[he] forgot" and "[he] missed it." The

4

complainant told appellant that he "was going to go ahead and clean it up with a wet rag." Then appellant accused the complainant of giving Demonbreun two different "quotes to do the texture on the house" and asked him why "was [he] trying to charge her . . . different prices." The complainant saw that appellant "was raising his voice" and "getting angry." Appellant left the bathroom, and the complainant followed him out. But as the complainant exited the bathroom, he "saw [appellant] with his hands up, swinging" a two-by-four board at him. The complainant estimated that the two-by-four board was about three or four feet long.

The complainant's "first reaction was [to] raise [his] hand to cover" his face, and appellant struck the complainant's arm with the two-by-four board, breaking the arm. Appellant "knocked [the complainant] down" onto his hands and knees. All the complainant could remember was that appellant kept hitting him with the two-by-four board and that "[Dennee] was yelling at [appellant] to stop." Appellant kept striking the complainant "all over [his] body," on his head, arm, ribs and back. Then appellant chased the complainant out of the house, still wielding the two-by-four board. The complainant ducked into his sport utility vehicle ("SUV") and locked the doors.

The trial court admitted into evidence the audio recording of the assault that the complainant made with his cellular telephone. The recording begins before the complainant enters Demonbreun's garage and ends when the complainant gets into

5

his SUV. The complainant confirmed that he was the person who could be heard moaning on the recording and that the other speaker was appellant.

The complainant further testified that when he first got into his SUV, he stopped the audio recording so he could call for emergency assistance. The complainant thought he would be safe inside the SUV, but appellant "kept on swinging" the two-by-four board and broke the back passenger and driver's side windows on the SUV. Then the complainant saw appellant drop the two-by-four board in the grass, get into his car, and drive off. Dennee left the home a little later in her own car. Before she left, the complainant recorded her license plate number and gave it to the emergency-assistance operator. After completing his emergency-assistance call, the complainant called his wife to let her know what had happened.

According to the complainant, an ambulance and emergency medical technicians ("EMTs") arrived at Demonbreun's home first. They helped the complainant get out his SUV and put him inside the ambulance. A law enforcement officer also arrived and interviewed the complainant about the assault. The complainant was taken to a hospital in the ambulance.

The complainant explained that he sustained cuts and bruises and he was diagnosed with a severe concussion and a broken arm.[2] He was in bed and unable to walk for about two weeks. He and his family moved away from Demonbreun's neighborhood as soon as they could. The complainant continued to receive threatening telephone calls from appellant. When the complainant would answer, he would hear heavy breathing and what sounded like a gun cocking.

According to the complainant, after the assault, he was unable to resume physical labor and suffered from severe headaches. He could not go outside during the day "because the [sun]light was too bright." It took the complainant a year before he "g[o]t back on [his] feet" and was able to "start walking right" and "at least walk in the yard." The complainant was afraid to continue working as a contractor.

Houston Police Department ("HPD") Officer J. Heslop testified that on the evening of October 15, 2017, while on patrol, he was dispatched to a home at 451 Woodrail Street to respond to an emergency call about an assault that had just occurred. When he arrived, he found an ambulance at the scene and EMTs attending to the complainant.

According to Officer Heslop, the complainant had "his head wrapped," "dark bruising on his forehead and right shoulder," "some redness and scratching on his

_____

[2] The trial court admitted into evidence copies of the complainant's medical records.

ribcage," and "some swelling on his left . . . forearm." The complainant was "complaining of injuries and just trying to figure what was going on." The complainant's wife and daughter were panicked, frantic, and worried about the complainant's condition. While at the scene, Heslop noticed that the rear passenger windows on the complainant's SUV, which was parked on the street, were cracked and "the glass was shattered."

Officer Heslop spoke briefly with the complainant and then spoke with his wife. The complainant's wife pointed to a piece of wood—a two-by-four board around two feet long with two nails sticking out of the end—that was by the front door of the home. The complainant's wife stated that the board was "involved in the assault." The trial court admitted into evidence the two-by-four board and photographs of the two-by-four board. Heslop stated that he considered the two-by-four board to be a deadly weapon.

Officer Heslop further testified that the complainant's injuries "seemed very severe." And based on his training and experience as a law enforcement officer, Heslop did not think the injuries had been caused by someone's hand.

Through speaking with the complainant, his wife, and his daughter, as well as two other law enforcement officers that had responded to the scene, Officer Heslop learned that the complainant was a contractor who had been doing construction work for Demonbreun, the owner of the home. Heslop also was able to identify appellant

8

as the perpetrator of the assault. Because appellant and Dennee had fled the scene, Heslop was unable to locate them and interview them that night. But he learned appellant's telephone number, the location where he worked, the type of car he drove, and the name and location of the hotel where appellant might have been staying.

Two days after the assault, Officer Heslop received a telephone call from the complainant and went to speak with him in person. The complainant had a sling on his left arm and injuries from the assault.

Houston Fire Department firefighter and EMT J. Paramore testified that on October 15, 2017, he was dispatched to 451 Woodrail Street in response to an assault that had occurred. When he and another EMT arrived at the scene, they found the complainant in an SUV and they "started their patient assessment, talking to him and evaluating him." The complainant was "alert and oriented [to] place, time, and event." The complainant told them that he had been assaulted. Paramore observed that the complainant "had some bruising already" and he appeared to be in severe pain. They administered fentanyl intravenously to treat the complainant's pain.

HPD Detective D. Morrison testified that he was assigned to investigate the assault of the complainant. As part of his investigation, he had a telephone conversation with appellant, who told Morrison that his "relative [had been] having some problems with [the complainant]" and she had asked appellant to take over her

communications with the complainant, including "doing walk-throughs, talking about money and possibl[e] mistakes" that the complainant had made. Appellant told Morrison that the complainant had "bumped" appellant in a hallway in Demonbreun's home as he was "trying to leave" and hit him "shoulder to shoulder." Appellant admitted that he assaulted the complainant, but he denied using a two-by-four board in doing so. According to appellant, "there was an argument in the house about some finances and the work that was done." Appellant told Morrison that "he could not explain [the complainant's] injuries."

Detective Morrison testified that, after evaluating all the evidence in the case, including his interviews with witnesses, the complainant's audio recording, and the two-by-four board found at Demonbreun's home on the day of the assault, he believed that appellant used the two-by-four board to assault the complainant. Morrison stated that the two-by-four board is a deadly weapon.

Detective Morrison also explained that he found the complainant to be "credible, meaning, [that he] didn't find him doing this out of other means." Because Morrison believed that there was probable cause to arrest appellant, he "call[ed] the Harris County District Attorney's Office," which accepted the charges.

Demonbreun testified that her home, located at 451 Woodrail Street, sustained substantial flood damage because of a hurricane. Six inches of water inundated the home during the storm. When the insurance adjuster came after the storm, he told

Demonbreun that she had to tear out two feet of drywall in the house and four feet of drywall in the garage.

Demonbreun did not stay at the house after the hurricane because of the home's condition, but she spent some time there most days cleaning and emptying the dehumidifiers. One day, the complainant "was driving by in his [SUV] and he stopped and asked [her] if [she] had flood damage." They had a short conversation, and the complainant "agreed to put drywall in [her] garage" to "help [her] out." Demonbreun paid him $250 to "start the work" in the garage. Then, she "gave him a check for $5,000 before he started [doing other work] in the house." When she saw the complainant's work, Demonbreun thought it "was shoddy." She "would point things out to him and he would get animated about them and ask, 'Well, did you think I was going to leave it this way?'" Demonbreun would respond, "Yeah, because you [did the work]."

Although Demonbreun was not happy with the quality of the complainant's work, she had already given him another check for $8,000. But when she "checked [her bank] account," she "noticed he had not cashed it." Demonbreun explained that "there came a point where [the complainant] wasn't returning [her] [tele]phone calls, he wasn't returning [her] text[] [messages], [and] he wasn't at the house doing any work," so she canceled the $8,000 check because she thought if she did, "he was going to have to come and talk to [her]."

11

The day Demonbreun canceled the $8,000 check, the complainant came to her house. He threatened that he would call law enforcement officers and have her charged with the offense of theft. Eventually, they reached an agreement that Demonbreun would pay the complainant the $8,000, and she went to the bank, withdrew the money, brought it back to the house, and gave it to the complainant.

Later that week, Demonbreun went to her house to mark the areas that had not been completed to her satisfaction. She understood that the complainant was "going to fix those areas." But the complainant still had the dining room to complete, and Demonbreun had become so exasperated that she did not "even want to deal with [the complainant] anymore." Her "kids," which included appellant, thought she should "let [the complainant] come back and fix the job." So she and appellant agreed that appellant would handle communications with the complainant. Demonbreun sent the complainant a text message telling him to "deal with [appellant]."

Demonbreun further testified that she knew that the complainant had an appointment scheduled for October 15, 2017, but she did not attend it. After 3:00 p.m. that day, she "started getting phone calls from [the complainant's cellular] [tele]phone in quick succession; and [because she] didn't answer his calls anymore, . . . [she] didn't answer [her telephone]." She then received a telephone call from Dennee. After speaking with Dennee, Demonbreun listened to the

voicemail message left by the complainant's cellular telephone. On the voicemail message, a female voice spoke in a "[v]ery threatening" tone, with "a lot of cursing," and told Demonbreun to answer her telephone.

Demonbreun then called law enforcement officers and "told them what [she believed] was going on and . . . that [she] was afraid to go to [her] house by [her]self." She asked for a law enforcement officer to meet her at the house. Demonbreun met the officer at a nearby gas station, and the officer escorted her to the house. They arrived at about 5:00 p.m. At the house, Demonbreun "wanted to make sure that all" the doors and windows "were locked and [she] deleted [her] garage code" because she knew that the complainant had the code to open her garage door. As she and the law enforcement officer "walked out the front door [of the house], [she] noticed that [her window] screens were slashed in the front [of the home]."

**Jury Charge Error**

In his first, second, and third issues, appellant argues that the trial court erred in instructing the jury because it submitted an improper definition of the term knowingly, failed to identify a third person harmed, failed to submit an application paragraph regarding defense of a third person, submitted incorrect instructions regarding culpable mental state and self-defense, and failed to sua sponte instruct the jury on the lesser-included offense of assault.

13

We review complaints of jury-charge error under a two-step process. *See Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2004); *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994). First, we must determine whether error exists in the trial court's charge. *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013). Second, if there is error, the court must determine whether the error caused sufficient harm to require reversal of the conviction. *Id.* If the defendant preserved error by timely objecting to the charge, we will reverse if the defendant demonstrates that he suffered some harm as a result of the error. *Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009). If, as here, the defendant did not object at trial, we will reverse only if the error was so egregious and created such harm that the defendant did not receive a fair and impartial trial. *Id.* at 26.

The trial court has an absolute duty to prepare a jury charge that accurately sets out the law applicable to the case. TEX. CODE CRIM. PROC. ANN. art. 36.14; *Oursbourn v. State*, 259 S.W.3d 159, 179 (Tex. Crim. App. 2008); *see also Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012) (purpose of trial court's charge to jury is to instruct jurors on all law applicable to case). It must give the instruction for the law applicable to the case regardless of whether it has been specifically requested. *Oursbourn*, 259 S.W.3d at 179–81.

This absolute duty does not extend to defensive issues. "[A] trial court has no duty to instruct the jury on unrequested defensive issues . . . ." *Id.* at 179. We review

14

a trial court's decision to exclude or include a defensive issue in its charge for an abuse of discretion, viewing the evidence in the light most favorable to its submission. *See Buford v. State*, 606 S.W.3d 363, 369 (Tex. App.—Houston [1st Dist.] 2020, no pet.); *see also Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006).

In his first issue, appellant argues that he was egregiously harmed by the trial court's purportedly improper definition of the term "knowingly" in its charge to the jury because the definition was not limited to the result of his conduct.

"Section 6.03 of the Texas Penal Code sets out: four culpable mental states—intentionally, knowingly, recklessly, and criminally negligently; two possible conduct elements—nature of the conduct and result of the conduct; and the effect of the circumstances surrounding the conduct." *Price v. State*, 457 S.W.3d 437, 441 (Tex. Crim. App. 2015); *see* TEX. PENAL CODE ANN. § 6.03. "In a jury charge, the language in regard to the culpable mental state must be tailored to the conduct elements of the offense." *Price*, 457 S.W.3d at 441. "A trial court errs when it fails to limit the language in regard to the applicable culpable mental states to the appropriate conduct element." *Id.*

Under Texas Penal Code section 22.01(a)(1), a person commits the offense of assault if he intentionally, knowingly, or recklessly causes bodily injury to another. TEX. PENAL CODE ANN. § 22.01(a)(1). A person commits the offense of aggravated

15

assault under Texas Penal Code section 22.02(a)(2) if he commits an assault as defined in section 22.01(a)(1) and he "uses or exhibits a deadly weapon during the commission of the assault." *Id.* § 22.02(a)(2).

In the abstract portion of the trial court's charge to the jury, the trial court defined the offense of aggravated assault, as alleged in the indictment, as follows:

> A person commits the offense of assault if he intentionally or knowingly causes bodily injury to another.
>
> A person commits the offense of aggravated assault if the person commits assault, as hereinbefore defined, and the person uses or exhibits a deadly weapon during the commission of the assault.

*See id.*; *see also id.* § 22.01(a)(1).

In his first issue, appellant complains about the following instruction included in the trial court's charge:

> A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

Appellant argues that because the offense of aggravated assault, as alleged in the indictment and defined in the trial court's charge, is a "result of conduct" offense, an intent to engage in conduct is not an explicit element to be proven. *See Garfias v. State*, 424 S.W.3d 54, 60 (Tex. Crim. App. 2014) (assaultive offense causing bodily injury constitutes result-oriented offense); *accord Welch v. State*, No.

16

07-16-00212-CR, 2017 WL 2608178, at *2 (Tex. App.—Amarillo June 12, 2017, pet. ref'd) (mem. op., not designated for publication).

The Waco Court of Appeals has concluded that the offense of aggravated assault by causing bodily injury, accompanied by the use or exhibition of a deadly weapon, is a result-oriented offense that also includes a nature-of-conduct element— namely, the defendant's use or exhibition of a deadly weapon. *Johnson v. State*, 271 S.W.3d 756, 761 (Tex. App.—Waco 2008, pet. ref'd); *see* TEX. PENAL CODE ANN. §§ 22.01(a)(1), 22.02(a)(2)  This Court has previously acknowledged the Waco Court of Appeals's ruling on this issue. *See Johnson v. State*, No. 01-13-00104-CR, 2014 WL 1004401, at *3 (Tex. App.—Houston [1st Dist.] Mar. 13, 2014, pet. ref'd) (mem. op., not designated for publication).  But rather than reach the issue, we, in the past, have presumed error because, as here, the definition in the trial court's charge of the term "intentionally" was limited to the result of the conduct, while the definition of the term "knowingly" was not.  And included in the definition of the term "knowingly" was a "circumstances surrounding the conduct" portion. *See id.* Here, we will also presume error in the trial court's charge.

Notably, the State, in its brief, concedes that our holding in *Johnson* also requires the conclusion that the trial court erred in including, in the abstract portion of its charge to the jury, that a "person acts knowingly, or with knowledge, with respect to . . . circumstances surrounding his conduct when he is aware . . . that the

17

circumstances exist." *See id.* at *4 (citing *Cook v. State*, 884 S.W.2d 485, 487 (Tex. Crim. App. 1994)).

Because we have presumed error and the State has conceded error in the trial court's charge, we must determine whether appellant has suffered egregious harm. *See id.* at *4–6; *see also Wooten*, 400 S.W.3d at 606; *Sakil*, 287 S.W.3d at 26. Egregious harm exists when the record shows that a defendant has suffered actual, rather than merely theoretical, harm from jury-charge error. *Almanza v. State*, 686 S.W.2d 157, 174 (Tex. Crim. App. 1984). Egregious harm consists of error affecting the very basis of the case or depriving the defendant of a valuable right, vitally affecting a defensive theory, or making the case for conviction or punishment clearly and significantly more persuasive. *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991); *Martinez v. State*, 190 S.W.3d 254, 259 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). To determine whether a defendant has sustained harm from either an objected-to or a non-objected-to jury-charge instruction, we consider: (1) the entire charge, (2) the state of the evidence, including the contested issues and the weight of the probative evidence, (3) the argument of counsel, and (4) any other relevant information revealed by the record of the trial as a whole. *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996); *Almanza*, 686 S.W.2d at 171.

As in our decision in *Johnson*, the trial court's charge to the jury, as a whole, weighs against a finding of egregious harm because its corresponding application

18

paragraph properly instructed the jury to find appellant guilty of the offense of aggravated assault only if it found that he intentionally or knowingly caused the result—i.e., caused bodily injury to the complainant—without any mention of the circumstances surrounding appellant's conduct. *See Johnson*, 2014 WL 1004401, at *4–5. "It is the application paragraph of the charge, not the abstract portion, that authorizes a conviction." *Crenshaw v. State*, 378 S.W.3d 460, 467 (Tex. Crim. App. 2012). "An abstract charge on a theory of law that is not applied to the facts does not authorize the jury to convict upon that theory." *Id.* And a jury "is presumed to have understood and followed the [trial] court's charge, absent evidence to the contrary." *Id.*

Further, the state of the evidence does not support a finding of egregious harm. The State proffered testimony through the complainant, Officer Heslop, firefighter and EMT Paramore, and Detective Morrison, as well as photographs, physical evidence, and medical records to prove that appellant intentionally caused bodily injury to the complainant by striking him with a two-by-four board. The direct testimony of Heslop and Morrison, as well as the other evidence, also supports the jury's finding that the two-by-four board constituted a deadly weapon because, given its manner of use or intended use, it was capable of causing death or serious bodily injury. *See* TEX. PENAL CODE ANN. § 1.07(a)(17).

Appellant also does not identify any argument of counsel that emphasized the erroneous jury instruction, and we find none. We conclude that any error in the trial court's instruction to the jury defining the culpable mental state did not affect the basis of the case or deprive appellant of a valuable right, vitally affect a defensive theory, or make the case for conviction or punishment clearly and significantly more persuasive. *See Saunders*, 817 S.W.2d at 692. Thus, we hold that any error in the trial court's charge complained about by appellant in his first issue did not cause sufficient harm to require reversal of appellant's conviction. *See Wooten*, 400 S.W.3d at 606.

We overrule appellant's first issue.

In his second issue, appellant argues that he was egregiously harmed by the trial court's failure to identify the third person harmed and to properly submit the application paragraph regarding defense of a third person because the record is not clear as to whom appellant would have been protecting and the trial court's instruction on defense of a third-person was "confusing and misleading."

In its charge to the jury, the trial court submitted the following application paragraph on defense of a third person:

> [I]f you find from the evidence beyond a reasonable doubt that [appellant] did strike [the complainant], as alleged, but you further find from the evidence, as viewed from the standpoint of [appellant] at the time, that from the words or conduct, or both of [the complainant], it reasonably appeared to [appellant] that his life or person, or the life of a third person, was in danger and there was created in his mind a

20

reasonable expectation or fear of death or serious bodily injury to himself or a third person, from the use of unlawful deadly force at the hands of [the complainant], and that acting under such apprehension and reasonably believing that the use of deadly force on his part was immediately necessary to protect himself or a third person against [the complainant]'s use or attempted use of unlawful deadly force, he struck [the complainant] with a wooden board, then you should acquit [appellant] on the grounds of self-defense or defense of a third person; or if you have a reasonable doubt as to whether or not [appellant] was acting in self-defense or in defense of a third person on said occasion and under the circumstances, then you should give [appellant] the benefit of that doubt and say by your verdict, not guilty.

If you find from the evidence beyond a reasonable doubt that at the time and place in question [appellant] did not reasonably believe that he or a third person was in danger of death or serious bodily injury, or that [appellant], under the circumstances as viewed by him from his standpoint at the time, did not reasonably believe that the degree of force actually used by him was immediately necessary to protect himself or a third person against [the complainant]'s use or attempted use of unlawful deadly force, then you should find against [appellant] on the issue of self-defense and on the issue of defense of a third person.

Appellant asserts that the evidence did not raise the issue of defense of a third person. He states that the evidence did not clearly show whether he was protecting a third person, such as Dennee, who was present during the assault but who did not testify at trial, or Demonbreun, who was not present when the assault occurred. But appellant concedes, in his brief, that the evidence shows that "there were words spoken as [a]ppellant, the complainant, and Dennee entered the house and went to the bathroom area." Further, the complainant's audio recording of the assault constitutes some evidence that the complainant arguably raised his voice at Dennee during that encounter. Based on this evidence, the trial court could have reasonably

concluded that a defense-of-a-third-person instruction was warranted. *See Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013) (citing Texas Penal Code section 2.03(c) and noting "a minimum quantity of evidence is sufficient to raise a defense as long as the evidence would support a rational jury finding as to the defense"); *Braughton v. State*, 522 S.W.3d 714, 730 (Tex. App.—Houston [1st Dist.] 2017), *aff'd*, 569 S.W.3d 592 (Tex. Crim. App. 2018). Thus, we hold that the trial court did not err in including an instruction for defense of a third person in its charge to the jury.

As to appellant's assertion that the defense-of-a-third-person application paragraph in the trial court's charge erroneously failed to identify the third person harmed, we note that when the abstract portion of a jury charge contains a definition or instruction on a defensive theory of law, the corresponding application paragraph must list the specific conditions under which a jury is authorized to acquit. *Vega v. State*, 394 S.W.3d 514, 520 (Tex. Crim. App. 2013). The State concedes, in its brief, that the identity of a person pertinent to the defensive issue, such as the name of the third person in this case, is a specific condition that should have been included in an application paragraph in the trial court's charge. *See id.* (defensive jury instruction on entrapment was erroneous where application paragraph failed to name specific person who was acting as a law-enforcement agent).

Here, however, the evidence shows that Dennee was the only third person present during the assault, so the jury, which ultimately rejected the defense, would not have been confused by the trial court's omission. And although appellant complains that the State, in its closing argument, criticized the inclusion of the defense-of-a-third-person instruction in the trial court's charge, the State's remarks fairly responded to the argument of appellant's counsel and addressed self-defense and defense of a third person together.

We also disagree with appellant's assertion that the inclusion of the defense-of-a-third-person instruction in the trial court's charge trivialized his self-defense theory. The trial court's instructions to the jury on self-defense and defense of a third person were separate defensive issues, and the defense-of-a-third-person instruction thus did not comment on the weight of the evidence supporting the self-defense instruction, which the jury also rejected. *See Morales v. State*, 357 S.W.3d 1, 5 n.15 (Tex. Crim. App. 2011) (instruction constitutes comment on weight of the evidence if it is not grounded in statute, is covered by general charge to the jury, and focuses jury on specific type of evidence that may support element of offense or defense). Thus, we hold that any error in the defense-of-a-third-person application paragraph in the trial court's charge did not cause sufficient harm to require reversal of appellant's conviction. *See Wooten*, 400 S.W.3d at 606.

We overrule appellant's second issue.

In his third issue, appellant argues that he was egregiously harmed by the cumulative effect of the trial court's erroneous jury instructions regarding culpable mental state and defense of a third person and its failure to sua sponte instruct the jury on the lesser-included offense of assault because, as a cumulative result of these errors, "[t]he jury charge was misleading and incomplete causing confusion to the jury" and appellant was denied a fair and impartial trial. *See Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) ("It is conceivable that a number of errors may be found harmful in their cumulative effect.").

Here, we have already concluded that any of the trial court's jury-charge errors in defining culpable mental state did not cause egregious harm and the trial court did not err in including an instruction to the jury on defense of a third person. As to the lack of an instruction on the lesser-included offense of assault, a trial court has no obligation to sua sponte instruct the jury on a lesser-included offense when, as here, neither party requested the instruction. *See Tolbert v. State*, 306 S.W.3d 776, 781–82 (Tex. Crim. App. 2010). As a result, we conclude that the trial court did not err by not including such an instruction in its charge.

Accordingly, we hold that appellant was not egregiously harmed by the cumulative effect of the trial court's instructions to the jury on culpable mental state

24

and defense of a third person and its failure to sua sponte instruct the jury on the lesser-included offense of assault.

We overrule appellant's third issue.

**Ineffective Assistance of Counsel**

In his fourth issue, appellant argues that his trial court did not provide him with effective assistance of counsel because trial counsel did not object to the trial court's instructions to the jury on culpable mental state and defense of a third person or to certain portions of Detective Morrison's testimony and counsel did not cross-examine the investigating officer or the complainant about the complainant's five arrests for the misdemeanor offense of assault, which included four arrests for the offense of assault of a family member.

The Sixth Amendment to the United States Constitution guarantees the right to the reasonably effective assistance of counsel in criminal prosecutions. U.S. CONST. amend. VI; *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001); *see also* TEX. CONST. art. I, § 10; TEX. CODE CRIM. PROC. ANN. art. 1.05; *Hernandez v. State*, 726 S.W.2d 53, 55–57 (Tex. Crim. App. 1986) (test for ineffective assistance of counsel same under both federal and state constitutions). To prove a claim of ineffective assistance of counsel, appellant must show that (1) his trial counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for his counsel's unprofessional errors,

25

the result of the proceeding would have been different.  *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  In reviewing counsel's performance, we look to the totality of the representation to determine the effectiveness of counsel, indulging a strong presumption that counsel's performance fell within the wide range of reasonable professional assistance or trial strategy.  *See Robertson v. State*, 187 S.W.3d 475, 482–83 (Tex. Crim. App. 2006).  Appellant has the burden to establish both prongs by a preponderance of the evidence.  *Jackson v. State*, 973 S.W.2d 954, 956 (Tex. Crim. App. 1998).  "[A]ppellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong." *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009); *see also Strickland*, 466 U.S. at 697.

Although appellant filed a motion for new trial, he did not raise his ineffective-assistance of counsel complaints in his motion and he did not present an affidavit from his trial counsel addressing his ineffective-assistance-of-counsel complaints with his motion for new trial.[3]  A trial record alone is rarely sufficient to

---

[3]  In his motion for new trial, appellant argued that he was entitled to a new trial because the trial court improperly defined the term "knowingly" in its instructions to the jury, improperly submitted an instruction to the jury regarding defense of a third person and did not identify the third person at risk of being harmed, and failed to submit an instruction to the jury on the lesser-included offense of assault.  The

26

show ineffective assistance of counsel. *Williams v. State*, 526 S.W.3d 581, 583 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd). And generally, a silent record that provides no explanation for trial counsel's actions will not overcome the strong presumption of reasonable assistance. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005); *see also Mata v. State*, 226 S.W.3d 425, 431 (Tex. Crim. App. 2007) (noting "presumption that trial counsel's performance was reasonably based in sound trial strategy"). In the rare case in which trial counsel's ineffectiveness is apparent from the record, an appellate court may address and dispose of the claim on direct appeal. *Lopez*, 343 S.W.3d at 143. But the record must demonstrate that trial counsel's performance fell below an objective standard of reasonableness as a matter of law and no reasonable strategy could justify trial counsel's acts or omissions, regardless of counsel's subjective reasoning. *Id*.; *see also Menefield*, 363 S.W.3d at 593 (when trial counsel is not given opportunity to explain his actions, "the appellate court should not find deficient performance unless the challenged conduct was so outrageous that no competent attorney would have engaged in it" (internal quotations omitted)).

---

affidavit from appellant's trial counsel that accompanied the new-trial motion only addressed the evidentiary rulings that counsel believed amounted to a violation of appellant's right to a fair trial. The affidavit did not address any of counsel's alleged failings that comprise appellant's ineffective-assistance-of-counsel complaints of appeal.

As to appellant's argument that his trial counsel was ineffective because he failed to object to the instructions in the trial court's charge about defense of a third person, we have already concluded that some evidence supported the submission of the instruction on defense of a third person, so trial counsel's performance did not fall below an objective standard of reasonableness by not objecting to that instruction. *See, e.g.*, *Odom v. State*, Nos. 14-11-00206-CR to 14-11-00212-CR, 2012 WL 1964580, at *5 (Tex. App.—Houston [14th Dist.] May 31, 2012, no pet.) (mem. op., not designated for publication) ("Trial counsel is not ineffective for failing to make futile objections."); *Cooper v. State*, 707 S.W.2d 686, 689 (Tex. App.—Houston [1st Dist.] 1986, pet. ref'd) (failure to object to admissible evidence not ineffective assistance). Thus, we conclude that appellant has not established that his trial counsel's performance fell below an objective standard of reasonableness for failing to object to the trial court's instructions to the jury about defense of a third person.

Further, as to appellant's complaint that his trial counsel was ineffective for failing to object to the trial court's instruction to the jury on culpable mental state, we have also already concluded that any errors in the trial court's charge to the jury in defining culpable mental state did not cause egregious harm to appellant. If a jury charge error does not amount to egregious harm, a defendant cannot show that there is a reasonable probability that, but for his counsel's unprofessional errors, the result

28

of the proceeding would have been different. *Tottenham v. State*, 285 S.W.3d 19, 34 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). Because appellant has failed to show that he suffered egregious harm due to the trial court's instruction to the jury on culpable mental state, we conclude that appellant has failed to show that there is a reasonable probability that, but for his trial counsel's error, the result of the proceeding would have been different.

Appellant also asserts that trial counsel was ineffective for failing to cross-examine the investigating officer and the complainant regarding the complainant's history of five arrests for the misdemeanor offense of assault, including four arrests for the offense of assault of a family member. Texas Rule of Evidence 609(a) permits evidence of a witness's criminal conviction to be offered to attack the witness's character for truthfulness if the crime was a felony or involved moral turpitude, the probative value of the evidence outweighs its prejudicial effect, and it is elicited from the witness or established by public record. Tex. R. Evid. 609(a). But when the criminal conviction is more than ten years old, admission is barred unless the proponent shows that the probative value of the conviction substantially outweighs its prejudicial effect. Tex. R. Evid. 609(b).

The complainant's criminal history, which was provided pretrial to appellant's trial counsel, shows that the complainant received "deferred probation" for the offense of assault of a family member in 2011, and the charges for the

29

remaining other assault offenses were all dismissed. None of the arrests resulted in final convictions and nothing in the record shows that any of the charged assaults involved moral turpitude. Appellant's trial counsel could have reasonably determined that those arrests were inadmissible for purposes of impeachment or that cross-examination about those arrests would open the door for the State to offer rebuttal evidence that was harmful to appellant. Because plausible strategic reasons exist for declining to cross-examine the investigating officer or the complainant on the complainant's prior arrests for the offense of assault, we conclude that appellant has not established that his trial counsel's performance fell below an objective standard of reasonableness.

Finally, appellant argues that trial counsel was ineffective because he did not interpose a proper objection to Detective Morrison's testimony about the process of filing charges and the process he used to evaluate evidence in the case and recommend that charges be filed against appellant. Although appellant's trial counsel objected to the complained-of testimony as improper expert opinion, appellant asserts that the proper objection would have been to bolstering the credibility of the complainant and commenting on the appellant's guilt because Morrison's testimony substantiated the State's position that the complainant was credible.

Even if appellant's trial counsel erred in failing to object to Detective Morrison's passing remark as to the complainant's credibility, appellant has not shown that if counsel had made a bolstering objection, the result of the proceeding would have been different. *See Strickland*, 466 U.S. 668 at 694. The State brought Morrison as a witness to testify about the investigative procedure utilized in the case, and the trial court allowed the testimony because the questions focused on Morrison's evaluation of the evidence to present charges to the Harris County's District Attorney's Office, which, the trial court noted, was "exactly what his job is to do." Further, even without Morrison's testimony, the jury could have reasonably deduced that an investigator found the complainant's account of the assault to be credible simply because criminal charges were brought against appellant. And the trial court's charge instructed the jury: "You are the exclusive judges of the facts proved, of the credibility of the witnesses and the weight to be given their testimony." Absent evidence to the contrary, we presume that the jury followed the instructions set forth in the trial court's charge. *Beltran De La Torre v. State*, 583 S.W.3d 613, 620 (Tex. Crim. App. 2019); *Scott v. State*, 555 S.W.3d 116, 124 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd). Based on the foregoing, we conclude that appellant has failed to show that there is a reasonable probability that, but for his trial counsel's purported error, the result of the proceeding would have been different. *See Jackson*, 973 S.W.2d at 956.

31

We hold that appellant has not satisfied his burden to establish his ineffective-assistance-of-counsel complaints.

We overrule appellant's fourth issue.

## Modification of Judgment

Here, the trial court's written judgment does not accurately comport with the record in this case in that it states that appellant "[p]leaded [t]rue" to the allegations in a "2nd [e]nhancement [p]aragraph." The trial court's written judgment also states "N/A," meaning "not applicable," in regard to the jury's "[f]inding on 1st [e]nhancement [p]aragraph." *See Dromgoole v. State*, 470 S.W.3d 204, 226–27 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (judgment incorrectly reflected trial court's finding on enhancement paragraph was "n/a," meaning "not applicable" (internal quotations omitted)). The record, however, does not reveal that appellant entered any plea on a "2nd [e]nhancement [p]aragraph." Further, the record shows that the jury's finding on the "1st [e]nhancement [p]aragraph" was "true."

"[A]ppellate court[s] ha[ve] the power to correct and reform a trial court judgment 'to make the record speak the truth when [they] ha[ve] the necessary data and information to do so[] or make any appropriate order as the law and nature of the case may require.'" *Nolan v. State*, 39 S.W.3d 697, 698 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (quoting *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet ref'd)). This is true no matter who, or if anyone, has called

the matter to the attention of the appellate court. *See French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992); *Dromgoole*, 470 S.W.3d at 226; *see also Asberry*, 813 S.W.2d at 529–30 ("The authority of an appellate court to reform incorrect judgments is not dependent upon the request of any party, nor does it turn on the question of whether a party has or has not objected in the trial court.").

Accordingly, we modify the trial court's judgment to state "N/A" in regard to appellant's plea to the "2nd [e]nhancement [p]aragraph." We further modify the trial court's judgment to state "True" in regard to the jury's "[f]inding on 1st [e]nhancement [p]aragraph." *See* TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993).

## Conclusion

We affirm the judgment of the trial court as modified.


Julie Countiss
Justice

Panel consists of Justices Keyes, Hightower, and Countiss.

Do not publish. TEX. R. APP. P. 47.2(b).